**TOLCHESTER LINES, INC., Plaintiff,**

v.

**Thomas P. DOWD, Ben Dittenhofer, Nassau Marine, Inc., and Sound Steamship Lines, Inc., Defendants.**

**No. 66 Civ. 554.**

United States District Court
S. D. New York.
April 28, 1966.

Tanner & Friedman, New York City, for plaintiff; Arthur S. Friedman, Charles D. Klein, New York City, of counsel.

Arthur H. Beyer, New York City, for defendants.

FRANKEL, District Judge.

Plaintiff, alleging diversity of citizenship, seeks injunctive relief and damages for alleged breach of trust and misappropriation of its excursion charter business by an employee, defendant Thomas P. Dowd, for an alleged conspiracy among Dowd and the other defendants to accomplish this misappropriation, and for defendants' alleged taking and use of confidential business information. By order to show cause, returnable March 8, 1966, plaintiff sought an injunction *pendente lite*. Since the controversy concerned a seasonal boat excursion business concentrated in the spring and summer of the year, and since it appeared impossible to unravel the opposing claims of the parties on their affidavits, it was determined that the case should be set down for prompt trial on the claim for a permanent injunction and damages. Accordingly, with the consent of defendants, based in part upon the expectation of a speedy final decision, plaintiff was granted a limited temporary injunction on March 14,[1] and the case was scheduled for trial beginning March 21, 1966.

As sometimes happens, a trial estimated to require two days turned out to extend over eight days. At the conclusion of the evidence, pending submission of post-trial briefs and rendition of a final decision, the court granted a defense motion to vacate the injunction as to all defendants other than Dowd, who has remained subject until now to the restraints in the order of March 14, 1966 (see footnote 1, *supra*). On April 15, 1966, having received post-trial memoranda the day before, and having ordered further briefs by April 22, 1966, we enjoined the defendants other than Dowd, pending a final decree, from making further payments of commission or other compensation to Dowd based upon the charter business which is the subject of the controversy.

Now, having appraised the evidence and resolved, *inter alia*, problems of credibility posed in several significant

1. All the defendants were restrained (1) from taking any action as to potential charterers with which defendant Dowd had been in touch between September 1, 1965, and January 18, 1966, while "acting or purporting to act on behalf of plaintiff"; (2) from assigning or otherwise disposing of three specified charter contracts which had already been obtained for the 1966 season; and (3) from representing in any manner that they (the defendants), or any of them, were associated with the plaintiff.

aspects of the testimony, we reach the following findings and conclusions.

## I. *Facts*

For several years prior to 1963, defendant Dowd had been employed by excursion boat owners as a solicitor of one-day excursion charters with schools, clubs, and various other social and business organizations. The vessels for which such charters were made were equipped to accommodate as many as 2,000 or more excursioneers for riding, dancing, drinking, and general frolicking on moonlight rides or round trips between New York City and such places as Bear Mountain and Playland in Rye, New York. Dowd solicited charters in 1962 for the Wilson Line, which paid him a salary of $125 per week plus expenses. In 1963 he worked for Keansburg Steamboat Company, which paid him a commission of 10% on the gross receipts of charters he obtained for the company's excursion vessel, the City of Keansburg. In addition to these commission payments, Keansburg paid office rent and expenses connected with Dowd's soliciting and selling activities.

Over the course of the years Dowd built something of a following among the groups and organizations interested in the kind of excursion service he handled. Social committee chairmen and similar functionaries came to rely upon him to help in the planning of their outings. At least in some instances, the testimony showed, they relied upon Dowd without giving particular heed to the name of the company owning the vessel they chartered.

Equipped with his experience and his contacts among organizations interested in excursion charters, Dowd went in the early autumn of 1963 to Arlington, Virginia, and put a business proposal to B. B. Wills, president of plaintiff corporation. Wills had been in the recreation and excursion business for some 29 years. The plaintiff corporation, substantially owned by Wills, had formerly owned a picnic and amusement park at Tolchester Beach on the Chesapeake Bay near Baltimore, Maryland. Another of Wills's corporations, Wills Development Corporation, owned a vessel, the SS Potomac, with a capacity of about 1,850 passengers, suited for the sort of excursions in which Dowd had been dealing. Wills himself, through one or another of his corporations. using the Potomac and other vessels ⸺ore that, had been engaged in the excursion business in such various places as Boston, Jacksonville, Baltimore, Charleston, South Carolina, and New York.

At his meeting with Wills in Arlington, Dowd produced a list of 30 charters he had obtained for the City of Keansburg in the 1963 season. The list showed the name of each chartering organization, the name of the person in it responsible for the charter, the date, and the destination point. Dowd proposed to Wills that they join forces; that Wills have the Potomac suitably repaired, fitted, and certificated to operate in the New York area; and that he (Dowd) be retained to obtain charters beginning with the 1964 season. Dowd whetted Wills's appetite for the venture by stressing his Keansburg list, predicting that he could obtain many or most of the 1963 Keansburg charterers for the Potomac in 1964. He proposed that Wills accept the same arrangements as those he had had with Keansburg, paying Dowd 10% of the gross charter receipts.

Wills displayed prompt interest in Dowd's idea. However, he did not accept, but temporized vaguely about, Dowd's proposal for a 10% commission. Wills expressed his preference that Dowd serve as a full-time salaried employee, holding out hopes of shared profits if the New York venture prospered. The evidence on this subject of compensation grows dim and distant at this point. What emerges is that Wills sent Dowd back to New York authorized to start obtaining charters for the Potomac in 1964; that both Dowd and Wills were satisfied to leave temporarily uncertain the terms on which Dowd was to be paid; and that each hoped, and perhaps expected, that

his version of the relationship would come to be realized in the event.

Dowd returned to New York to begin his solicitations for charterers of the Potomac. By the end of 1963, he signed four charters for 1964. In the end he managed to procure a total of 37 charters for the Potomac in 1964. Of these, 12 had been City of Keansburg charters in 1963.

By the close of 1963, Wills and Dowd had opened an office for the chartering enterprise in New York City. The rent and supplies were paid for by plaintiff, through Dowd. A secretary was hired, also paid by plaintiff, which, similarly, paid bills for advertising, telephone and other expenses. By February of 1964, letters passed between Wills and Dowd, along with oral discussions, had substantially crystallized their relationship. Dowd had become a salaried employee, at first paid $125 per week, later $150. Dowd continued to claim that his compensation was to have been a 10% commission, not the salary. Wills from time to time talked ambiguously about this as a possibly open question. Eventually Dowd's dissatisfactions led to the oddly executed rupture that culminated in this litigation. But Wills never agreed to pay commission, and Dowd accepted, while grumbling, the weekly salary checks (with tax withholdings and other employee-style deductions) plaintiff paid him.

And so, with Dowd's resentments periodically expressed by letter or telephone, the parties continued through the 1965 season. Dowd's efforts were more productive for this second year, when the Potomac had a total of 66 charters in New York, grossing $142,000. Wills looked forward to still happier returns in 1966. Dowd, through the last months of 1965, encouraged these bright hopes by promising further increases in the business.

But as the winter of 1965 approached, Dowd grew increasingly restive. Among other things, it became problematical whether the Potomac would be able to continue to accept charters for Bear Mountain. Interstate Commerce Commission authority was required for this. Plaintiff had obtained a temporary, seasonal permit for 1964 and 1965. Its application for permanent authority faced an uncertain future. In November, 1965, Dowd wrote a charter for May 29, 1966, for an excursion to Bear Mountain. On November 16 or 17, 1965, Mrs. Elware Egan, plaintiff's secretary, returned the charter to Dowd, explaining the certification problem and asking him to postpone Bear Mountain arrangements while plaintiff continued its efforts before the I.C.C. In December, 1965, an I.C.C. hearing examiner recommended denial of the Bear Mountain certificate. As this is written, plaintiff's appeal to the Commission remains pending.

In addition to his concern over this Bear Mountain difficulty, Dowd continued to nurse resentment about not being paid on a commission basis. As he later testified on trial, he finally became "fed up" and stopped working for plaintiff on November 18, 1965. At this point, though he related it with bland frankness on the stand, his conduct became bizarre and lawless.

Dowd neglected to mention to plaintiff or any of its principals that he had quit his job. Instead, he continued to communicate with Wills and Mrs. Egan at plaintiff's Arlington, Virginia, office, promising that the charters they were awaiting would be forthcoming very shortly. He continued to supply them with encouraging projections of expected 1966 business. He continued to take and cash his pay checks. But he attended at plaintiff's New York office only once or twice a week, and then only to pick up mail, return telephone messages, and engage in business which was not merely other than plaintiff's, but in direct conflict with his duties to plaintiff.

At some time in November 1965 Dowd had learned that defendant Ben Dittenhofer was in process of acquiring the SS Bay Belle, an excursion vessel with a larger passenger capacity than plaintiff's Potomac. On November 23, Dowd called Dittenhofer at the latter's home in Tom's

<br>

River, New Jersey, to propose a business meeting. Pouring the proverbial salt, Dowd used plaintiff's office telephone for this extended call.

Later in November, Dowd went to Tom's River and met with Dittenhofer. Repeating something like his 1963 transition from the Keansburg business to Wills, Dowd told Dittenhofer of his experience and contacts in the excursion chartering business. He painted glowing prospects of charter business for the Bay Belle. He told Dittenhofer that he had worked for plaintiff, but had terminated that employment. Dittenhofer did not learn until this lawsuit began that Dowd's resignation from plaintiff remained a secret so far as plaintiff was concerned. In these circumstances, Dittenhofer soon agreed to engage Dowd as agent to solicit charters for the Bay Belle, with Dowd to receive 15% of gross receipts.

Dowd then proceeded to collaborate with Dittenhofer in activities designed to further their endeavors together. Through Dowd's offices Dittenhofer and his wife acquired the stock of defendant Sound Steamship Lines, Inc., a largely dormant corporation which happened, significantly, to possess an I.C.C. authorization for transportation of passengers to Bear Mountain. Dowd also introduced Dittenhofer to a man who was taken on as the Bay Belle's captain.[2]

Dowd began in December of 1965 to solicit and obtain charter contracts for the Bay Belle. Meanwhile, plaintiff's principals were waiting in Arlington, Virginia, for the executed charters Dowd had led them to expect. In one or two instances, capitalizing on his well-knit personal relationships, Dowd arranged to transfer charters already executed from the Potomac to the Bay Belle. As it turned out, before his secret resignation, plaintiff produced a total of only eleven 1966 charters for plaintiff. His efforts on behalf of the Bay Belle resulted before

March 14, 1966, in 28 charters for gross prices totalling $65,950, on which Dowd earned commissions of $9,892.50. At the time of the trial herein, Dowd had been paid $5,000 of these commissions.

Toward the close of 1965, plaintiff's principals became increasingly concerned about the delay in the charters plaintiff had been promising. Finally, Mrs. Egan made an appointment to see Dowd at the New York office on January 18, 1966. When she arrived, she found the office deserted. Alarmed, she called Wills in Arlington, who in turn telephoned Dowd at his home that night. Dowd then for the first time announced his resignation. A day or two later, Wills received the following letter, dated the 19th:

"Dear Mr. Wills:

As I am sure you know, our agreement was that you were to pay me ten percent (10%) of the charter fees.

In 1965 this amounted to over $130,-000.00 or $13,000.00 commission. To date you have paid me $7650.00. The difference is considerable. As it is extremely unlikely that I can collect, I am hereby resigning. I did no work last week and am returning your check. This is final.

Yours truly
s/ THOMAS P. DOWD"

On February 25, 1966, plaintiff brought this action seeking the relief sketched at the outset of this opinion. Dowd has counterclaimed for the claimed difference between the compensation he received from plaintiff and the 10% commission he says he should have had. At the close of the evidence, he abandoned the counterclaim with respect to the year 1964.

II. *Legal Issues and Conclusions*

1. *Jurisdiction.*—Plaintiff, alleging that it is a Maryland corporation with its principal place of business in Virginia, brought the case here under

2. It may be noted here that the array of defendants other than Dowd amounts in substance to defendant Dittenhofer and his wife. They own defendant Nassau

Marine, Inc., which owned the Bay Belle at the time of trial. Their plan was to lease it, apparently through another corporation, to their corporation, Sound.

the court's diversity jurisdiction, 28 U.S. C. § 1332. Defendants, residents of New York and New Jersey, originally admitted the jurisdictional allegations. After trial, however, as was their right, defendants urged that there was a failure of jurisdiction in that the evidence showed plaintiff's "principal place of business" to be the New York office from which defendant Dowd operated. See 28 U.S.C. § 1332(c).

■ There is no question that plaintiff is incorporated under the laws of Maryland. And the evidence shows its principal place of business to be in Arlington, Virginia, as alleged. That is where its officers spend the great bulk of their time. It is from there that plaintiff has directed operations and managed property in several states, including Maryland, New York, Massachusetts, the District of Columbia, Texas, and other Atlantic seaboard ports. The New York activities, which did not exist at all before 1963, have been primarily seasonal. And there is a wry note here in that, whatever defendant thought, it really had nobody functioning for it in New York in the months preceding the start of this litigation.

This is an appropriate case for placing the corporation's "principal place of business" where its officers work and direct its destinies. That place is in Virginia. The court's diversity jurisdiction has been properly invoked. Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862 (S.D.N.Y.1959); Hughes v. United Engineers & Constructors, Inc., 178 F.Supp. 895 (S.D.N.Y.1959).

■ 2. *The case against Dowd.*—The liability of defendant Dowd seems clear. His secret resignation on November 18, 1965, followed by two months of work in square conflict with his employer's interests (while continuing to take his pay, and continuing to represent that he was working for it), was a flagrant breach of trust. A. S. Rampell, Inc. v. Hyster Company, 3 N.Y.2d 369, 377, 165 N.Y.S.2d 475, 482, 144 N.E.2d 371, 376–377 (1957); Harry R. Defler Corporation v. Kleeman, 19 A.D.2d 396, 243 N.Y.S.2d 930 (4th Dep't 1963), appeal dismissed, 13 N.Y.2d 1174, 248 N.Y.S.2d 53, 197 N.E.2d 540 (1964). The problem that has posed some difficulty is the fashioning of suitable relief.

We conclude that Dowd is liable for damages but that plaintiff is entitled to no further injunctive relief against him.

■ a. *Damages.*—Two possible measures of damages could be deemed suitable: first, the unlawful gains Dowd realized as a result of his betrayed trust (e. g., Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928); Reis & Co. v. Volck, 151 App.Div. 613, 136 N.Y.S. 367 (1st Dep't 1912); Restatement (Second), Agency § 403); second, such damages to its business as plaintiff can show from the misbehavior (e. g., Duane Jones Company v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954); Harry R. Defler Corporation v. Kleeman, supra). The two are not to be cumulated, but plaintiff is entitled to the amount of its losses if these exceed Dowd's ill-gotten gains. Cf. Sialkot Importing Corp. v. Berlin, 295 N.Y. 482, 487, 68 N.E.2d 501, 503 (1946); Harry R. Defler Corporation v. Kleeman, supra, 19 A.D.2d at 403–404, 243 N.Y.S.2d at 937–938. In the peculiar circumstances of this case, however, computation of plaintiff's provable losses, if any, must await developments over the next few months. Accordingly, we will reserve jurisdiction as to that while providing now for plaintiff's recovery of Dowd's unlawful earnings from his breach of trust.

■ As to these earnings, the evidence establishes that in the period from November 18, 1965 to January 18, 1966, while ostensibly working for plaintiff, Dowd obtained 14 charters for the Bay Belle at gross prices of $32,600.[3] An additional 10 Bay Belle charters, for a

3. Salem Methodist Church ($2,625); Mater Christi High School ($1,600); Hudson County Bar Association ($2,100); St. Andrews Episcopal Church ($2,625); St. Thomas Liberal Catholic Church ($2,-625); Le Grandeur Sporting Club ($2,-

gross of $24,425, were executed after January 18, 1966, as a direct result of Dowd's efforts during the same two-month period and of his corresponding lack of effort on behalf of plaintiff.[4] Thus, on the uniform testimony of Dowd and his co-defendant Dittenhofer that Dowd earned 15% commission, his return on the foregoing total of $57,025 in charters amounted to $8,553.75. These earnings belong to plaintiff.

The question of plaintiff's lost business, and whether it will amount to a figure larger or smaller than Dowd's illicit earnings, is impossible to answer at this time. Plaintiff claims on this basis "at least $100,000." Whether it will be entitled to anything like that—or any more than the $8,553.75 we have awarded as Dowd's unlawful gains—turns on uncertainties that will be resolved during the next few months, but could only be dealt with by guesswork at the present time. For example, at least since January 18, 1966, plaintiff has been (or should have been) working to recoup, and thus to mitigate its damages. The success of these efforts cannot be reckoned now. Moreover, as this is written, it remains undetermined whether plaintiff will be authorized to take Bear Mountain charters for the coming season. If such authority is not obtained, plaintiff will probably lack ground for claiming that any of the Bay Belle charters to Bear Mountain represent losses to itself.

These questions of fact and others bearing upon the claim for lost profits will be answerable with relative certainty when the coming summer has ended. Having found Dowd a wrongdoer, we could perhaps proceed to speculate about what the future holds on the general principle "that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). It is more sensible, however, to postpone the problem for the brief period required to substitute recent history for dubious predictions. This is especially appropriate in this case where the initial demand for an injunction has led to a trial long in advance of what would normally have been the scheduled time. Cf. Harry R. Defler Corporation v. Kleeman, 19 A.D. 2d 396, 403–404, 243 N.Y.S.2d 930, 937–938 (4th Dep't 1963); Kaminsky v. Kahn, 23 A.D.2d 231, 243–244, 259 N.Y. S.2d 716, 729 (1st Dep't 1965); International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696, 703 (3d Cir. 1957), cert. dismissed, 355 U.S. 943, 78 S.Ct. 529, 2 L.Ed.2d 523 (1958); John T. Lloyd Laboratories, Inc. v. Lloyd Bros. Pharm., 131 F.2d 703, 708 (6th Cir. 1942).

---

625); Bermuda Benevolent Association ($2,625); Sons & Daughters of St. Christopher ($2,625); Brotherhood of Sleeping Car Porters ($2,625); St. Saviours School ($1,575); Cardinal Spellman High School ($2,100); Lapel Makers and Parers Union ($2,100); Bishop Ford High School ($2,100); Mount Olivet Baptist Church ($2,650).

4. Medina Temple No. 19, contract dated Feb. 9 ($2,625); Victoria Benevolent Ass'n, Jan. 26 ($2,625); 3 Jills and 1 Jack, Jan. 26 ($2,625); Associated Services Aerospace Employment Agency, Jan. 27 ($2,200); Lodges & Chapters of the Second Masonic District, Feb. 14 ($2,-100); Mayor John J. Armellino Ass'n, Feb. 8 ($2,000); Loyal Heirs of Love and Good Will, Jan. 26 ($2,625); Long Island Lighting Company Employees Ass'n,

Feb. 7 ($2,500); Y.B.E. c/o Mrs. Pearline Smalls, Jan. 31 ($2,625); Ridgewood High School, Jan. 31 ($2,500).

We grant no damages as to four other Bay Belle contracts (with Mr. Henry Lewis, the Star of the Sea Knights of Columbus Council, St. Vincent's Benevolent Ass'n, and Latino International Club), because there appears to be no causal connection between Dowd's misfeasance and his obtaining these.

Also, we find that no damages are appropriate with regard to charterers who were approached by Dowd between November 18 and January 18 but who have not yet signed contracts. The injunction which has bound Dowd to inaction for six weeks has restored to plaintiff an equal footing in the competition for these charterers.

Accordingly, while the decree will award plaintiff $8,553.75 against Dowd, jurisdiction will be reserved for plaintiff to seek additional relief on its alternative claim for lost profits. If after the summer's end, plaintiff deems itself entitled to such relief, the matter may be brought on by the service of a suitable motion not later than November 1, 1966. If such a motion is not filed by that date, the question will be closed. Since there is no just reason for delay, the decree to be entered now will be a final one on all aspects of the case other than plaintiff's possible claim for loss of profits. See Rule 54(b), Fed.R.Civ.P.

■ b. *Injunctive relief.*—As noted at the outset, plaintiff seeks extensive relief by way of injunction. We conclude now that no such relief can be justified. At this point, we outline the reasons for this conclusion with respect to Dowd, notwithstanding his unquestioned wrongdoing.

Essentially, as to Dowd, plaintiff seeks to destroy his means of livelihood by forbidding his further solicitation of excursion charters. This is strong medicine, administered most sparingly in equity. See, e. g., Purchasing Associates, Inc. v. Weitz, 13 N.Y.2d 267, 272, 274, 246 N.Y. S.2d 600, 604, 605, 196 N.E.2d 245, 247, 249 (1963); Paramount Pad Co. v. Baumrind, 4 N.Y.2d 393, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958); L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431, 441 (N.Y.Co.1948). It is not justified here.

We note again that Dowd has been under a preliminary injunction for over six weeks. This has had the effect of permitting plaintiff to try to catch up for the two-month period during which Dowd lulled it into inaction. While it may be that the losses from that period are not wholly reparable, we find no warrant for further paralysis of Dowd's efforts to earn his living.

Plaintiff's claim of "trade secrets" was dissipated at the trial. The secrets, such as they were, had been Dowd's to begin with. It was he who had known the organizations and the people from whom to solicit charters. As a result of Dowd's efforts—and, indeed, of this lawsuit as well—plaintiff has been placed in possession of substantially all such information derived from him. It is now in a position to compete for the business on an equal footing, though without Dowd's assets of personality and personal acquaintances, such as they may be. Plaintiff is entitled to no more. Cf. Scott & Co., Inc. v. Scott, 186 App.Div. 518, 527, 174 N.Y.S. 583, 586 (1st Dep't 1919).

Plaintiff never paid for and never got a restrictive covenant barring Dowd's future competition. Even if it had, it would probably fail in its claim for injunctive relief. Purchasing Associates, Inc. v. Weitz, supra; and see, generally, Blake, Employee Agreements not to Compete, 73 Harv.L.Rev. 625, esp. at 663–67 (1960). However that may be, it seems clear that the granting of such relief in the absence of a restrictive agreement would be totally unjustifiable.

Accordingly, we deny the prayer for permanent injunctive relief against defendant Dowd and vacate as of this date the outstanding injunction against him *pendente lite.*

■ 3. *The case against defendants other than Dowd.*—Plaintiff has failed entirely to prove the conspiracy it alleged between Dowd and the other defendants. The crux of the case in this aspect relates to Dittenhofer, the principal through whom the defendant corporations acted.

The proof shows that Dittenhofer believed Dowd to be a *former* employee of plaintiff after November 1965, just as Wills presumably viewed Dowd in relation to the Keansburg Steamboat Company back in 1963. On these facts, plaintiff has no basis for the award of either injunctive relief or compensatory damages against any defendant other than Dowd.

Plaintiff has argued eloquently that Dowd's knowledge of his unlawful status should be "imputed" to the other defendants. At least, plaintiff says, having learned of the taint in the charters obtained through Dowd, these defendants

should now be prepared (or, in any case, required) to disgorge the contracts[5] or the profits to be derived from them. We do not agree.

Preliminarily, we recall that defendant Dittenhofer had acquired the Bay Belle before he ever heard of Dowd. When Dowd appeared at Tom's River, Dittenhofer was considering various alternatives for the profitable use of his new acquisition. When he chose Dowd's proposal, he gave up others. There is no way now to restore him to his pre-Dowd situation. Such a change of position precludes any remedy even for the period after notice of Dowd's malfeasance had been acquired by Dittenhofer personally. This is illustrated sufficiently by the opinion of Judge Learned Hand in Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150, 156–157 (2d Cir. 1949), denying relief to a plaintiff which showed, as plaintiff here could not, violation of a restrictive covenant and betrayal of trade secrets by defaulting employees to the successfully defending employers. And see Restatement, Torts, § 758(b), cited in that opinion.

Plaintiff is mistaken, in any event, in arguing that Dowd's wrongdoing should be imputed to the other defendants. Again, the cited opinion of Judge Hand suffices. On the record before us, as in that case, "the situation is proper for the application of the doctrine that a bona fide purchaser takes free from a trust." 172 F.2d at 156. Here, as there, the services for which defendants employed Dowd, in ignorance of his breach of duty to plaintiff, were transactions "in which [Dowd] was the opposite party and did not represent them in any way." Id. at 157; see also Tree Plateau Co. v. Mt. Vernon Mills, 22 A.D.2d 587, 590, 257 N.Y.S.2d 733, 736 (1st Dep't 1965). It stretches the notion of "agency" beyond

recognition, and beyond the limits of any sensible policy, to think of Dowd as the other defendants' "agent," and charge them with his knowledge, respecting his dealings or misdealings with his former employer.

One final matter remains with respect to the defendants other than Dowd. Because the evidence showed that Dowd might well be judgment proof, and on the admission of the other defendants that they were liable to him for commissions to which he appeared, in our judgment, to be disentitled, these remaining defendants were enjoined after trial (on April 22, 1966) from making further payments of commission to him. Now it appears that there is no ground for holding these other defendants liable directly to plaintiff. Accordingly, leaving to plaintiff whatever remedies it may have for enforcement of its award against Dowd, the injunction against the other defendants, dated April 22, 1966, will remain in effect only for twenty days after the entry of judgment herein and will thereafter be deemed to have been vacated without further order of the court.

**Dowd's counterclaim.**—Dowd proved no agreement to pay him the 10% commission upon which his counterclaim is based. The evidence shows that Wills was less than forthright in their dealings on this subject. He told other people Dowd would be receiving a 10% commission. He held out hopes of greater compensation to Dowd. But he managed at every critical juncture to refuse Dowd's demands that there be an agreement to this effect. And Dowd lived along for two years in which the parties worked together on the salary basis Wills wanted.

If there were no more to the case, we might still hesitate to reject the counterclaim. There are other facts, however,

---

5. Plaintiff's demand that it be given the Bay Belle contracts is, on its face, extravagant and unsound. For one thing plaintiff is obviously incapable of performing these contracts, which specify the Bay Belle as the boat to be used and allow each charterer to bring 2,400 people aboard whereas the Potomac can legally carry only 1,850 persons. Apart from this, plaintiff is obviously not entitled to acquire contracts with third parties who have chosen the Bay Belle and who are not before the court.

to buttress this result. As we have said, the counterclaim has been abandoned for 1964 because Dowd actually received as much as, or more than, the 10% commission rate would have given him. For the year 1965, Dowd received $8,162.50, and claims $6,275, or a total compensation in excess of $14,000 based upon charters of over $140,000 gross. However, on Dowd's own account of the vaguely fumbling terms in which the parties negotiated, he stood ready to work for a 10% commission while bearing his own business expenses out of that return. It becomes significant, therefore, to note that plaintiff during 1965 paid $1,850 for rent on the New York office, approximately $500 more for office supplies, about $3,000 for secretarial help, and an additional amount (which is not perfectly clear from the record) for postage, telephone, and other incidental expenses. In addition, Dowd received after November 18, 1965, $1,350 in pay to which he was clearly disentitled after he had ceased faithfully to represent the plaintiff. See Harry R. Defler Corporation v. Kleeman, 19 A.D.2d 396, 404, 243 N.Y.S.2d 930, 938 (4th Dep't 1963), appeal dismissed, 13 N.Y.2d 1174, 248 N.Y.S.2d 53, 197 N.E.2d 540 (1964).

Taking these obvious deductions from Dowd's alleged counterclaim would leave him nothing. The counterclaim should be, and it is, dismissed.

In the exercise of discretion we conclude further that there should be no

award of costs in this case. See Rule 54(d), Fed.R.Civ.P.; Newton v. Consolidated Gas Co., 265 U.S. 78, 83, 44 S.Ct. 481, 68 L.Ed. 909 (1924); 6 Moore, Federal Practice ¶ 54.70[3] (2d ed. 1965).[6]

Counsel will submit proposed decrees in accordance with the foregoing conclusions.

---

6. The complaint alleged, as it was required to, that plaintiff was licensed to do business in New York. On that allegation, among others, plaintiff was permitted to maintain the suit (see N.Y.Bus.Corp. Law, McKinney's Consol.Laws, c. 4, § 1312(a)), and was granted temporary injunctive relief on March 14, 1966. When defendants questioned the existence of the New York certificate, counsel for plaintiff investigated, found there was none, and hastened to repair the defect on March 18, 1966. When this subject was explored at the trial, plaintiff's officers gave evasive and unedifying testimony, claiming they had "believed" the corporation was licensed in New York. While we conclude that the initial absence of a certificate is not fatal to the action (cf. Oxford Paper Co. v. S. M. Liquidation Co., 45 Misc.2d 612, 257 N.Y.S.2d 395 (N.Y.Co.1965)), plaintiff's performance on this aspect of the case is hardly to be approved, and constitutes adequate ground in itself for denying costs. In addition, the evidence showed that plaintiff conducted its operations in New York, at least in their inception, through another Wills corporation which was not actually the owner of the SS Potomac, demonstrating a casual disregard for the rights and protection of groups chartering the vessel. On this subject, too, plaintiff's president gave evasive testimony.