**KOEHRING COMPANY, Plaintiff,**

v.

**NATIONAL AUTOMATIC TOOL COM-
PANY, Inc., Defendant.**

Civ. A. No. IP 60–C–285.

United States District Court
S. D. Indiana,
Indianapolis Division.

July 20, 1966.

William A. Denny, Milwaukee, Wis., Wolfe, Hubbard, Voit & Osann, Chicago, Ill., Lockwood, Woodard, Smith & Weikart, Indianapolis, Ind., for plaintiff.

Bair, Freeman & Molinare, Chicago, Ill., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for defendant.

## OPINION

DILLIN, District Judge.

This action was commenced October 24, 1960, by the filing of a complaint asserting four claims seeking compensatory and injunctive relief for the alleged infringement of certain patents, and seeking an assignment of patents. On August 24, 1961, plaintiff added two additional claims charging defendant with unfair competition and conspiracy. Jurisdiction admittedly exists in this court pursuant to 28 U.S.C. §§ 1332 and 1338. The Court having previously heard the evidence, and having considered the post-trial briefs of the parties, now enters its findings of fact and conclusions of law pursuant to Rule 52 (a), F.R.Civ.P.

### I.

### BACKGROUND OF THE CONTROVERSY

Plaintiff Koehring Company (hereinafter "Koehring") is a Wisconsin corporation having its principal office in Milwaukee. It manufactures and sells machinery. The Hydraulic Press Manufacturing Company (hereinafter "HPM") was an Ohio corporation which also manufactured and sold machinery, including plastics injection molding machines, which it commenced manufacturing in about 1934. It was merged into Koehring June 30, 1956, and has since continued as an unincorporated division of Koehring. Defendant National Automatic Tool Company (hereinafter "NATCO") is an Indiana corporation having its principal place of business at Richmond, Indiana. It has been a machinery manufacturer for many years, and more recently a manufacturer of plastics injection molding machines in competition with plaintiff.

Plastics injection molding machines make molded plastic articles by melting thermoplastic material and injecting it into a mold. Such machines had been manufactured for more than twenty years when NATCO entered the field in 1955. The machines being manufactured at that time had major components functionally similar to the machines of Koehring and NATCO which are here involved.

During 1954 and 1955, HPM was in a chaotic condition. Although operating at a profit, it was undercapitalized and its 1954 machines were late in production and had encountered operating difficulties. Its board chairman and president were in a battle for control, and its secretary-treasurer, vice-president of manufacturing, vice-president in charge of sales, and director of engineering all left the company. It was known to the employees that the company was being offered for sale, with possible liquidation to follow.

Two of the second echelon company executives, Russell W. Powell, sales manager, and Richard M. Norman, chief engineer of the machinery division, decided to join the exodus as a team. They hoped to find employment with a company not in the molding machinery line, but which was interested in diversifying; they believed they had a chance to better themselves, and to produce a better machine, by starting from scratch with a new company. NATCO was such a company, and after they were brought together by a mutual contact, NATCO hired them to design and sell molding machines.

Powell and Norman resigned effective April 29, and commenced work at NATCO on May 2, 1955. Meanwhile, Kenneth Sherer, an HPM design supervisor working under Norman, advised Norman of his own desire to leave HPM and was hired by Norman for NATCO. He reported May 15, 1955. These three did the original NATCO design work, and were joined October 17, 1955 by Theodore D. Rhoads,[1] another HPM designer solicited for NATCO by Powell.

Powell, Norman and Sherer had each signed employment contracts with

---

1. Rhoads went back to work for HPM in 1957.

HPM.[2] The factual issues in this action involve, in large part, the extent to which they violated such agreements, if at all, and the extent to which such violations, if any, may be charged to NATCO, as sole defendant.

## II.

## FIRST CAUSE OF ACTION— THE HUELSKAMP PATENT

United States Letters Patent No. 2,821,750 issued February 4, 1958 on the application of Donald E. Huelskamp, filed November 24, 1954. Plaintiff is the owner of such patent, which relates to an apparatus and method for effecting accurate alignment between the sprue bushing hole in the die head of an injection molding machine and the injection nozzle. Plaintiff charges the defendant with infringement of this patent; the defendant denies infringement, and pleads invalidity of the patent.

In a plastics injection molding machine, the die head on that part of the machine which contains the injection mechanism contains a hole into which is fitted a die ring. A bushing, pierced by another hole (sprue) through which the plastic moves from the injection nozzle into the mold, is then fitted into such ring. It is necessary for the injection nozzle to meet the sprue with precision. Prior to Huelskamp, alignment of the sprue bushing with the injection nozzle was generally obtained by moving the injection assembly and its nozzle with respect to the base of the machine, upon which was mounted the die head and

sprue bushing. These parts are massive, and it was sometimes difficult and time consuming to fit them together.

Huelskamp aligned the bore of the sprue bushing with the nozzle, without moving the injection assembly. He provided a die ring positionable on the die head by use of a die ring centering tool (die ring gauge locater), which placed the centerline of the bore of the die ring in coaxial relation with the centerline of the nozzle. The sprue bushing, with its centered bore, was then substituted for the locater in the die ring. In his apparatus and method the die ring was first attached loosely to an oversize counter-bore in the die head by cap screws set in holes having clearance to enable the locater and ring to be shifted during alignment. When the locater and ring were in proper position the screws were tightened temporarily. The placement was then made permanent by affixing the die ring to the die head with pins, whereupon the sprue bushing was substituted for the locater.

Huelskamp attempted to describe the foregoing in his patent application. Neither his drawings nor specifications disclosed the clearance around the cap screws; on the contrary, they were illustrated as being in a fixed position during alignment. The Patent Office examiner denied the application as inoperable. On April 8, 1957 the applicant filed an amendment, including a new drawing, disclosing and illustrating for the first time the adjustability of the die ring and its locater relative to the

---

2. The agreements of Powell and Norman are identical, and include promises as follows: "To treat as confidential the information and knowledge which I obtain as to your trade secrets, that is, in relation to your patents and methods of manufacture and the use and manner of construction and manufacture of your products and equipment, and I will not, while in your employ or at any time thereafter, disclose to anyone, directly or indirectly, any such trade secrets; and That I will disclose to you all inventions, improvements, and discoveries made or conceived by me while in your employ, which relate or appertain

in any manner, directly or indirectly, to your business, and that I will, upon your request, make applications for letters patent of the United States and other countries, covering such inventions and improvements, and assign all such applications to you without charge beyond my compensation above referred to, and further I will execute all instruments and documents which may be necessary or desirable to vest in you and your assigns the exclusive rights to all such inventions, improvements, applications and patents."

The Sherer agreement is substantially similar to those of Powell and Norman.

screws. It was disallowed as containing new matter, but is significant in that it clearly shows what Huelskamp thought he had invented.

The patent is entitled "Nozzle Locating Device." The description in the specification is as follows: "The device 28 includes generally a die ring 36 *and a die ring gauge locater 37.*" This, then, was the contemplated apparatus. The method of alignment is set out as follows: "*The engagement of the die ring gauge locater 37* with the injection nozzle 29 and the die ring 36 causes the center line 59 of the inner peripheral wall 44 of the die ring 36 to lie on the axis 51 of the injection nozzle 29." The die ring gauge locater was considered an integral part of the apparatus throughout the prosecution of the patent. Unaccountably, however, after an office interview as to which no record was made, the examiner approved the five claims in issue, omitting all reference to the die ring gauge locater in apparatus claims 1–4.

■ We hold claims 1–4 to be invalid. The device is inoperable as illustrated because of the failure to disclose that the die ring is shiftable in relation to the cap screws. Moreover, absent the die ring gauge locater from such claims, there is no means disclosed for accomplishing or maintaining the desired alignment. The apparatus is incomplete. For the die ring to be shiftable, even if the discrepancy regarding the cap screws be overlooked, is not enough. The center of the ring must be precisely aligned with the center of the injection nozzle, and claims 1–4 omit means for so doing.

■ It is the claim which measures the grant to the patentee, and it must particularly point out and distinctly claim an identifiable discovery or invention; an unambiguous claim which overclaims the invention by omitting an essential element described in the specifications (or not described at all) is invalid. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672.

■ An adjustable die ring or die holder was not novel *per se* in 1954, but had been disclosed at least as early as U.S. Patent No. 893,939 (Royle), issued July 21, 1908, and again in U.S. Patent No. 1,180,399 (Houben), issued April 25, 1916, neither of which patents was considered by the Patent Office in connection with the Huelskamp patent. Therefore, if claims 1–4 of the patent as issued are to be construed as granting a monopoly on the concept of an adjustable die ring, without more, they would further be invalid for want of invention. 35 U.S.C. § 102(a).

■■ The fifth claim of the patent is valid. It was infringed by NATCO, prior to issuance, in NATCO's first eleven molding machines. Huelskamp's idea was known to Powell, Norman and Sherer prior to issuance of the patent, and they deliberately appropriated such conception and incorporated it into the offending NATCO machines. Plaintiff is entitled to damages from the defendant for such infringement, the actual damages to be measured by the profit made from the sale of the infringing machines, as determined by an accounting, or by a reasonable royalty, whichever is the greater. 35 U.S.C. § 284.

■■ After issuance of the Huelskamp patent, NATCO changed the nozzle locating means and method used in its machines to that described in U.S. Patent No. 2,983,957, issued to it May 16, 1961 as assignee of the C. S. Tudela, the inventor. Plaintiff charges continued infringement in that use of the Tudela construction infringes claims 1–4 of Huelskamp. Since those claims have been found invalid, it follows that there can be no infringement. Hoover Co. v. Mitchell Mfg. Co., 269 F.2d 795 (7th Cir., 1959). Further, we find that the Patent Office granted the Tudela patent on the premise that it was patentably different from the Huelskamp patent, cited as a reference, and not a mere improvement over Huelskamp. We **agree.**

## III.

### SECOND CAUSE OF ACTION— HYDRAULIC CIRCUIT PATENT

United States Letters Patent No. 2,804,752 issued September 3, 1957, on an application of Norman and Powell filed March 5, 1956. It was issued to NATCO, as assignee of the inventors. Koehring charges that the inventors conceived their invention while in the employ of HPM, hence were obligated by their contracts to assign it to HPM. Plaintiff demands that NATCO be held to be a constructive trustee as to title to the patent, be ordered to assign it to Koehring, and that it be found to have infringed the same.

The patent relates to a hydraulic circuit for a molding machine. The circuit uses one reversible delivery pump for reciprocating both the mold closing and injection motors, with a hydraulic diverter being included in the circuit between the pump and the two motors. The associated electrical control circuit is designed so as to shift the diverter only when the pump is in a neutral position, so as to reduce excessive hydraulic shock. NATCO uses this circuit in its molding machines, and has stressed its advantages in its advertising, commencing in 1957. It refers to it in such advertising as its "closed circuit" system. However, both the use of a "closed circuit" and a reversing pump were old in the art prior to 1955.

Plaintiff emphasizes that in 1952 Powell wrote a memorandum to HPM management in which he suggested[3] that the company should check on the possibilities of employing a "closed circuit operating system" in its injection molding machines, pointing out that "(t)he closed circuit system was the basic reason for the success of the H-P-M metal working presses * * *." This, plaintiff says, proves invention by Powell while in HPM's employ. We are not persuaded. The suggestion is far too general. Monsanto Chemical Works v. Jaeger, 31 F.2d 188 (D.C.Pa., 1929); DeLong Corporation v. Lucas, 176 F. Supp. 104 (D.C.N.Y., 1959). Further, it merely suggests use of a concept already in commercial use by HPM in a related field. To suggest that a company adapt a hydraulic circuit already in use by it on one species of press for use in another species of press, without suggesting novel means for so doing, would not constitute invention.

HPM used a reversing pump in a hydraulic circuit in a plastics injection molding machine sold to Dow Chemical Company in 1954. It forwarded a "Sequence of Hydraulic Operation" and a print of the piping diagram to Dow on September 16, 1954 and thereby fully disclosed the circuit. Plaintiff argues that the Dow circuit was invented by Norman and Powell, and that their patent finds response therein. If plaintiff is correct, it must fail on its second cause as a matter of law; since there was a complete, non-confidential disclosure to Dow on September 16, 1954, it follows that no one could have obtained a valid patent thereon, unless by application filed within one year therefrom. 35 U.S.C. § 102(b); Koehring Co. v. National Automatic Tool Co., Inc., 362 F.2d 100 (7th Cir., 1966).

However, we find that Norman and Powell were not the originators of the Dow circuit, and further find that such circuit was not invention, hence unpatentable in any event. Hydraulic circuits are old in the art, and there are infinite ways in which to design such a circuit, together with its associated electrical circuit. As between various circuits accomplishing the same end results, we find that the difference amounts to a mere choice of design, and is not patentable.

None of the ten claims of Patent No. 2,804,752 finds response in the Dow circuit. The sole novelty found by the Patent Office in such patent, and com-

---

3. He actually made a total of 97 separate suggestions, all in general terms and capsule form, in the course of a 25-page memorandum.

mon to its claims, is the concept of shifting the diverter only when the reversing pump is in a neutral position, and supplying positive means to insure this result.[4] The Dow circuit lacks such element, its circuit differs substantially from that of the patent, and it requires two pumps, rather than one, to reciprocate fully both hydraulic motors.

▐ Finally, plaintiff maintains that Norman and Powell had their design in mind before leaving HPM. This allegation must fail for want of proof. The great weight of the evidence is that they made many tentative designs after going to work for NATCO, and that the first design which they thought worthy of use, and therefore had witnessed, was dated June 7, 1955. This circuit differed substantially both from the Dow circuit and the patented circuit, and did not include the one patentable feature mentioned. We conclude that they conceived the patented circuit, including the neutral shift insurance idea, subsequent to June 7, 1955. At this time they were in the employ of NATCO. Plaintiff should take nothing by its second cause of action.

### IV.

### THIRD CAUSE OF ACTION—U.S. PATENT NO. 2,896,257

United States Letters Patent No. 2,896,257 issued July 28, 1959 on an application of Norman, Powell and Sherer filed November 21, 1955. The patent was issued to NATCO, as assignee of the inventors. Plaintiff again seeks assignment of the patent, on a constructive trust theory. The patent has ten claims and relates to a hydraulically operated injection molding machine having a single chamber for feeding, premelting and injecting plastic, being commonly referred to as an "in-line preplasticiser."

▐ Claims 1, 2, 4, 8, 9 and 10 of the patent read on a sketch made Sep-

tember 20, 1953 by one B. D. Ashbaugh, an HPM employee. The Ashbaugh sketch was made to evidence Ashbaugh's original conception and invention; we draw this inference from the fact that he caused it to be witnessed, as is customary when a possible patent application is contemplated. The witness was Powell, who submitted it in 1954 to Norman and to HPM's patent engineer for patent consideration.[5] There can be no doubt but that claims 1, 2, 4, 8, 9 and 10 of Patent No. 2,896,257 were conceived by Ashbaugh, rather than by Powell, Norman and Sherer, who knowingly appropriated them. Such conception likewise forms a part of the remaining claims 3, 5, 6 and 7. We find that the entire patent is invalid for want of invention by the claimed inventors. 35 U.S.C. § 102(f).

▐ Since the patent is void, it confers no rights on anyone and there can be no legal or equitable ownership of it. Hence the court will not order the assignment of such a patent. Kennedy v. Hazelton, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576; Friedman v. Washburn Co., 155 F.2d 959 (7th Cir., 1946); Tracerlab, Inc. v. Industrial Nucleonics Corp., 204 F.Supp. 101 (D.C.Mass., 1962). Plaintiff should therefore take nothing by its third cause of action.

### V.

### FOURTH CAUSE OF ACTION— FOREIGN PATENTS

▐ NATCO caused British and Canadian patents to be issued to it, corresponding to and claiming the inventions of U.S. Patents No. 2,804,752 and No. 2,896,257. Consistent with its second and third causes of action, plaintiff prays for assignment to it of such foreign patents. Plaintiff should take nothing by its fourth cause of action for the reasons stated in denying it relief on its second and third causes.

---

4. We do not decide whether or not this improvement was a sufficient advance over the prior art to justify issuance of the patent, as being beyond the issues.

5. No patent was applied for by Ashbaugh.

## VI.

### FIFTH & SIXTH CAUSES OF ACTION—UNFAIR COMPETITION AND CONSPIRACY

In its fifth cause, plaintiff charges that NATCO has wrongfully (a) appropriated to its own use secret and confidential information, trade secrets and "know how", including drawings, blueprints and records owned by HPM; (b) induced employees of HPM to leave its employ and take employment with NATCO; and (c) induced said employees and other former HPM employees to disclose said HPM trade secrets and "know how". The sixth cause charges that NATCO, Powell and Norman, prior to April 29, 1955, entered into a conspiracy to appropriate such trade secrets, etc., and that in furtherance of said conspiracy NATCO performed and directed the unlawful acts as set out in the first five causes of action. The sixth cause may be disposed of quickly.

 A civil conspiracy is a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not itself unlawful, by unlawful means. Holloway v. Thompson, 112 Ind. App. 229, 42 N.E.2d 421 (1942). A corporation may become a party to a conspiracy. Dorsey Machine Co. v. McCaffrey, 139 Ind. 545, 38 N.E. 208 (1894). There could be no unlawful purpose in defendant's deciding to enter into competition with plaintiff, nor in hiring Powell and Norman, or other HPM employees, all of whose employment of HPM was terminable at will. Grimm v. Baumgart, 121 Ind.App. 626, 96 N.E.2d 915, 97 N.E.2d 871 (1951); International Shoe Co. v. Lacy, 114 Ind. App. 641, 53 N.E.2d 636 (1944). The sole question, therefore, is whether Powell and Norman agreed with NATCO prior to April 29, 1955[6] to accomplish the lawful purpose of manufacturing molding machines by unlawful means, i.e., by appropriating secret and confidential information belonging to HPM in violation of HPM employment contracts.

 We find that NATCO did not agree with Powell and Norman to appropriate HPM trade secrets and confidential information, encourage them to cause others to do so, or agree that such could be used at NATCO. To the contrary, we find that NATCO expressly admonished them not to do so. Under these facts, we find that there was no conspiracy as charged.

 The charge in plaintiff's fifth cause that NATCO induced HPM employees to change employment is of no consequence, as above stated. We therefore consider the charge of appropriation of trade secrets, commencing with the Richard Hubbard incident. Hubbard, a former HPM manufacturing plant supervisor, who also had signed an HPM "secrecy" agreement, was hired by NATCO in March, 1958, a few weeks after HPM had fired him. He was hired as a consultant relative to manufacturing problems with NATCO's heating chamber, which he failed to solve. He also gave advice on heat treating certain parts. (Heat treating is a usual process in manufacturing machine parts). Hubbard's advice was based on his own knowledge, carried in his head, and did not constitute trade secrets of HPM. The mere fact that he may have acquired some or even all of his knowledge while working for HPM does not make it wrongful for him to sell it to others. Restatement of Agency, Second § 396(b), and Comments (b) and (h) (1958); Donahue v. Permacel Tape Corporation, 234 Ind. 398, 127 N.E.2d 235 (1955); Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Cal., 1958), aff'd 283 F.2d 695, cert. den. 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859.

6. The date is that of Powell and Norman's last day of work at HPM. Of course they could not conspire with NATCO after entering its employ, as a corporation cannot be liable for a conspiracy with one of its own employees. Pearson v. Youngstown Sheet & Tube Co., 332 F.2d 439 (7th Cir., 1964).

Other charges involve Powell, Norman and Sherer, who collectively took to NATCO prints of drawings for HPM's current molding machines, certain "Supplements to Proposals," showing performance data of such machines, an "HPM Engineering Standards Book" and an "HPM Data Book." Such material was used for reference by Sherer and his subordinates in designing NATCO machines,[7] and is alleged to constitute trade secrets.

■■ We find that such material, with the exception of that pertaining to the subject of the Huelskamp patent and Norman et al. Patent No. 2,896,257, did not constitute trade secrets or confidential information: The layout, assembly and some detail prints were freely furnished to purchasers; the "Supplements to Proposals" were widely distributed by the sales force; and the Standards Book contained primarily material to be found in any textbook on engineering. The Data Book contained prints of detail drawings, but the machines to which such prints pertained were sold to the public, so that the details could have been obtained by disassembly, measurement and analysis; parts manufacturers sold exact copies of some of the parts to the trade as replacements, and some of the components were purchased by HPM, rather than being manufactured by it. The plaintiff has failed to point out a single "secret" appearing in either the Standards Book or the Data Book. There can be no confidential information or trade secret in that which has previously been disclosed to the public without reservation. Skoog v. McCray Refrigerator Co., 211 F.2d 254 (7th Cir., 1954); Northrup v. Reish, 200 F.2d 924 (7th Cir., 1953).

■ The only case to which we have been cited in which, as here, the use of plaintiff's materials by its former employees was unknown to defendant second employer is Conmar Products Corp.

v. Universal Slide Fastener Co., 172 F.2d 150, (2nd Cir., 1949). The Court there, in an opinion by Chief Judge Hand, affirmed an order dismissing plaintiff's action, finding that the equities favored the innocent defendant, which had substantially changed its position before learning of the use of plaintiff's trade secrets. The case forecloses plaintiff's argument here that NATCO should be charged with the knowledge of its agents Powell, Norman and Sherer as to their own contracts of employment with HPM, holding that such knowledge will not be charged to the new employer who does nothing to induce the breach of such contracts.

■■ We agree that NATCO committed no tort; nevertheless, it obtained the benefit of its employees' unwarranted use of the HPM materials. We believe that, under all the facts, Indiana would imply a quasi contract for unjust enrichment, requiring the defendant to pay just compensation for the use of the materials. Clark v. Peoples Sav. & Loan Ass'n, 221 Ind. 168, 46 N.E.2d 681, 144 A.L.R. 1495 (1943). Plaintiff will be allowed such compensation as it may prove on further hearing, measured by the value of the time saved by defendant through use of its materials. See Midland-Ross Corporation v. Yokana, 293 F.2d 411 (3rd Cir., 1961), where relief for the taking of non-secret drawings was so limited, although the taking appears to have been tortious. Plaintiff also prays that its material be ordered returned to it; inasmuch as it has been destroyed, such prayer is moot.

## VII.

### ESTOPPEL

By way of affirmative defense to all but the first cause of action, the defendant pleaded that plaintiff is estopped to pursue its demands for equitable relief because of laches and lack of clean hands.

---

7. The NATCO machines are not copies of the HPM machines, do not resemble them except in the general way that all molding machines resemble each other, and have no identical parts save for a few minor items.

The clean hands defense is based on an episode of October, 1958, wherein certain of Koehring's officers and its patent attorney obtained and copied a complete set of NATCO's current prints. We do not infer that this action was taken to enable HPM to copy NATCO designs, but rather that HPM was resorting to self help to determine to what extent, if at all, NATCO was copying HPM designs. We do not feel that the clean hands doctrine is applicable.

As to laches, HPM management knew when Powell, Norman and Sherer left in 1955 that they were going to NATCO, and that they would be designing and selling competing machines. It also knew of NATCO's hiring of Rhoads in 1955 and Evans in 1956. NATCO's first machine was sold August 2, 1957, and its sales literature was available beginning in April, 1957. Its machine, including the "closed circuit", was described in detail in a June, 1957 trade journal, and the "closed circuit" patent issued September 3, 1957. Its machines were displayed at trade shows in 1957. HPM obtained complete copies of NATCO prints in October, 1958. In April, 1958 it forwarded NATCO a copy of Hubbard's employment agreement, but never at any time put NATCO on notice as to the agreements of Powell, Norman and Sherer. HPM officials visited with these individuals at the NATCO plant in late 1955, where they were shown a sketch of the proposed NATCO machine, but did not then or at any time protest their hiring. Defendant, since May 2, 1955, has expended well in excess of $100,000 in developing its machines and promoting their sale. Its patented hydraulic circuit is the basis of the circuit used in all of its machines.

We have found that plaintiff is entitled to no relief on its causes 2–6, inclusive, save on quasi contract as to Count 5. Considering the information available to plaintiff, its delay in complaining, and the defendant's change in position, we hold additionally that plaintiff's second cause of action, so much of its fourth cause of action as relates to the second cause, and its fifth and sixth causes of action to the extent that they pray for equitable relief other than return of materials are barred by laches. Fletcher v. Holmes, 25 Ind. 458 (1885); Conmar Products Corp. v. Universal Slide Fastener Co., supra; Restatement, Torts § 758 (1939). As to the third cause, and so much of the fourth as relates thereto, the plaintiff had no way of knowing of defendant's appropriation of Ashbaugh's idea until U. S. Patent No. 2,896,257 issued on July 28, 1959. Further, defendant has never expended any money in reliance on the patent. Laches has no application to such parts of the complaint.

## VIII.

### STATUTE OF LIMITATIONS

The defendant has also pleaded the Indiana statute of limitations as a defense to the fifth and sixth causes, filed August 24, 1961, without furnishing much light as to whether it considers the six year or the two year statute to apply.[8] Plaintiff argues for the fifteen year statute.[9]

The general rule is that, especially where forms of action have been abolished, as in Indiana, it is the nature or substance of the cause of action, rather than the form of the action, which determines the applicability of the statute of limitations. 53 C.J.S. Limitations of Actions § 33 p. 982. We have found the only relief to which plaintiff is entitled on its fifth and sixth causes to be founded on quasi contract for unjust enrich-

---

8. The six year statute applies, *inter alia*, to "First. On accounts and contracts not in writing," and * * * "Fourth. For relief against frauds." Burns' Ind.Stat. Ann. § 2–601; the two year statute applies, *inter alia*, to "First * * *

for injuries to personal property * * *." Burns, § 2–602.

9. Burns' Ind.Stat.Ann. § 2–603 provides: "All actions not limited by any other statute shall be brought within fifteen [15] years. * * *"

ment. The obligation which is implied by law is not a true contract, but it partakes of the nature of one and is governed by the statute of limitations applicable to oral contracts. Templeton Patents, Ltd. v. J. R. Simplot Co., 220 F.Supp. 48 (D.C.Idaho, 1963), aff'd 336 F.2d 261.

We believe that the six year statute applies. However, the action is not founded upon the taking of the material but upon its use, which extended until at least December, 1955. The statute therefore had not run as to the claim for unjust enrichment on the date of filing the fifth cause of action.

### IX.

### JUDGMENT AND FURTHER PROCEEDINGS

Judgment will be entered for the plaintiff on its first and fifth causes of action in accordance herewith, and the Court will retain jurisdiction with respect thereto for further hearing on the amount of damages to which plaintiff is entitled. Plaintiff's second, third, fourth, and sixth causes will be dismissed.