616 F.2d 1133
 206 U.S.P.Q. 213, 1980-2 Trade Cases 63,290
 CARPET SEAMING TAPE LICENSING CORPORATION, Plaintiff-Appellant,
v.
BEST SEAM INCORPORATED, Defendant-Appellee.
CARPET SEAMING TAPE LICENSING CORPORATION, Plaintiff-Appellant,
v.
VECTRON INDUSTRIES, INC. and Eugene J. Tasse, Defendants-Appellees.
 Nos. 77-3721, 77-3722.
 United States Court of Appeals,
Ninth Circuit.
 April 9, 1980.
 
 1
 Peter R. Taft, Munger, Tolles & Rickershause, Los Angeles, Cal., argued, for plaintiff-appellant; Laurence H. Pretty, Fulwider, Patton, Rieber, Lee & Utecht, Los Angeles, Cal., on brief.
 
 
 2
 William H. Pavitt, Jr., Smyth, Pavitt, Siegemond, Jones & Martella, Los Angeles, Cal., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Central District of California.
 
 
 4
 Before CHAMBERS and TANG, Circuit Judges, and ORRICK,* District Judge.
 
 ORRICK, District Judge:
 
 5
 In this case involving the validity and enforceability of a number of patents on products and processes used in seaming carpets, at the close of the plaintiff's case the trial judge held invalid a patent which was not in suit on the grounds of fraud against the Patent Office. The trial court then proceeded to declare invalid three other patents on the basis of the doctrine of unclean hands deriving from the fraud found in connection with the patent not in suit, and also on grounds of patent misuse. In finding fraud, the trial judge did not permit the plaintiff to prove good faith, nor did he require the defendant to prove by "clear and convincing evidence" that the fraud was either intentional or grossly negligent. In finding misuse, the trial judge failed to apply the appropriate standards for assessing the antitrust violations found, and specifically applied an erroneous standard to the question of whether the patents accumulated by the appellant were blocking patents. For these reasons, we reverse the judgment in favor of appellees and remand the case to the trial court for further proceedings not inconsistent with this Opinion.
 
 
 6
 * Appellant, Carpet Seaming Tape Licensing Corporation ("Carpet Seaming"), a Texas corporation holding the patents here involved, brought these actions against appellees, Best Seam Incorporated ("Best Seam"), a California corporation making and selling hot-melt adhesive carpet seaming tape, Vectron Industries, Inc. ("Vectron"), another California corporation also making and selling hot-melt adhesive carpet seaming tape, and Eugene Tasse, the president of Vectron and, with his wife, the owner of all of its stock, for patent infringement.
 
 
 7
 * The method for seaming carpets most accepted today is a face-seaming process using a hot-melt adhesive tape. Carpet sections are positioned pile-side-up on the floor, and the edges to be joined are rolled back just far enough to allow placement of the tape beneath the seam. The adhesive which is in solid form on the tape is then melted, and the carpet edges pressed down upon it for bonding as the adhesive resolidifies. This system has largely supplanted sewing as well as back-seaming (a process in which carpet sections are turned pile-side-down, and the seaming work is performed on the back of the carpet) since it allows the work to be done quickly and without the need for moving cumbersome sections of carpet once they have been positioned as the installer desires.
 
 
 8
 The tape utilized in this process is composed of three elements. The uppermost element is a layer of hot-melt adhesive. Hot-melt adhesive is solid and nonadhesive at room temperature. When heated, it becomes molten and forms a bond which it retains when cooled and resolidified. During the manufacturing of the tape, the adhesive layer is bonded to the second element of the tape, a layer of synthetic mesh which lends the tape strength. The seaming process actually involves the bonding of two pieces of carpet to this single strip of mesh. The final element of the tape is a paper barrier which prevents the adhesive layer from bonding to whatever lies beneath it when it is heated. As a further refinement, the adhesive layer is embossed into parallel ridges which melt into a single smooth layer of adhesive at the appropriate heat for bonding. The embossing feature provides the worker using the tape with a quick visual index for gauging adequate heating of the adhesive.
 
 B
 
 9
 Of the four patents directly at issue before the district court, three were originally obtained by Charles D. Burgess. Burgess "038" covers the three-element tape described above without the added feature of embossed ridges. Burgess "876" covers the seaming process described above using the "038" tape. Burgess "830" describes the process for manufacturing the "038" tape. The fourth patent (the "Winkler patent") was obtained by Alexander Winkler and covered tape using embossed ridges. Two other patents also involved were Burgess "703", a predecessor of the Burgess patents outlined above, which describes a process for seaming carpets using a two-element tape like the "038" tape but without the paper barrier, and a patent issued to Michael L. Clymin (the "Clymin patent") covering a three-element tape in which the adhesive is deposited in unconnected parallel bands on the tape rather than as ridges upon a smooth layer of adhesive as in the Winkler patent.
 
 
 10
 * Charles Burgess in March, 1966, produced a two-element tape and process which could be used successfully to seam carpets, but which required placing newspaper as a barrier beneath the tape to prevent the adhesive from sticking to the floor or padding below the tape. It was only on concrete floors that this step of placing newspapers beneath the two-element tape was not required, since the adhesive used by Burgess would not adhere to concrete. On March 14, 1966, Burgess sent himself a letter by registered mail in which he described his two-element process, and on March 18, 1966, he filed a patent application on the process which eventually resulted in issuance on December 10, 1968, of the "703" patent described above. Neither in his application nor in the letter did Burgess disclose the step of placing newspapers beneath the tape, although he regularly used this step in practicing and demonstrating his process. The trial court found that the use of such a barrier was known in the art of carpet seaming for many years prior to March, 1966 (Finding of Fact No. 101), Carpet Seaming Tape Licensing Corp. v. Best Seam Inc., 197 U.S.P.Q. 230, 240 (C.D.Cal.1977) (hereinafter cited as Carpet Seaming ), and that omission of this step, which it found necessary to the practice of the two-element process, constituted fraud by Burgess on the Patent Office invalidating not only the "703" patent, but the other three Burgess patents as well.
 
 
 11
 In May, 1966, Burgess added a paper barrier web as an element of his tape, and on December 6, 1966, he filed a second patent application, a continuation-in-part to his March 18 application, for patents on the three-element tape described above and the processes for making and using it. A continuation-in-part is an application filed during the lifetime of an earlier application by the same applicant repeating portions or all of the earlier application and adding matter not disclosed in the earlier application. The same Patent Examiner searched both applications together. After further Patent Office action, the December 6 application resulted in the issuance of the "038" patent on September 3, 1968, the "876" patent on October 13, 1970, and the "830" patent on February 16, 1971.
 
 
 12
 In January, 1968, Burgess sold his business and the pending applications to Giffen Industries, Inc. ("Giffen"), which subsequently transferred them to appellant.
 
 2
 
 13
 Besides obtaining exclusive licenses for the Burgess patents, appellant also obtained exclusive licenses for the Clymin patent[1] and the Winkler patent.[2]
 
 
 14
 The Burgess, Winkler, and Clymin patents have been available for licensing at a four percent royalty rate for flat tape and a five percent rate for embossed and ribbed tape. However, the trial court found that these royalty rates were anticompetitive in that they would cause competitors licensed to use the patents to either go out of business or raise their prices to a point at which they would be at a severe competitive disadvantage compared to Laminated Plastics, Inc., the manufacturing subsidiary of Giffen and the parent of Carpet Seaming. Finding of Fact Nos. 176, 177; Carpet Seaming, supra, 197 U.S.P.Q. at 246.
 
 II
 
 15
 Granting appellee's motion to dismiss at the conclusion of appellant's case-in-chief was not appropriate for the following reasons. First, the record was not developed fully enough to adequately determine the points of law upon which the judgment rested.[3] Second, the district court erred in the standard it applied for assessing the presence of fraud in connection with the Burgess "703" patent. In finding that Mr. Burgess had committed fraud on the Patent Office in failing to disclose the use of newspaper as a barrier web, the court failed to find that the omission of the step was intentional, grossly negligent, or in bad faith despite well-established law calling for clear and convincing evidence of such elements.
 
 
 16
 Third, the trial court labored under a misapprehension as to the relationship between two or more patents which can give rise to a blocking situation. The trial court found it necessary only to conclude that the Winkler and Clymin patents did not block the Burgess patents or each other. Not considered was the possibility that the Burgess patents might block the Winkler or Clymin patents, despite the fact that the case law establishes that basic patents may often block improvement patents on a basic product or process. This omission was significant, since a finding that the Burgess patents did block either Clymin or Winkler would have an impact on the inference to be drawn from the appellant's conduct in pooling those patents.
 
 
 17
 Finally, the trial court failed to articulate or apply appropriate standards in assessing the antitrust violations found at trial.
 
 
 18
 * Nowhere does the trial court articulate the standard it applied in assessing the presence of fraud in Burgess' application for the "703" patent. The conclusions of law reported in Carpet Seaming, supra, are unclear on this point.
 
 
 19
 Although the cases dealing with fraud on the United States Patent Office fail to show uniformity as to the exact standard for judging such fraud and although the standard varies both with the particular conduct and type of relief involved, nevertheless an indispensable element of subjective culpability is a consistent prerequisite for fraud in the relevant case law. 4 D. Chisum, Patents § 19.03(4) (1979); Cullen & Vickers, Fraud in the Procurement of a Patent, 29 Geo.Wash.L.Rev. 110 (1960).
 
 
 20
 "To be guilty of a breach of the duty of candor, the patent applicant must have had some culpable state of mind with respect to a misrepresentation or omission. A good faith mistake does not constitute fraud or inequitable conduct." 4 D. Chisum, Patents § 19.03(4) at 19-78 (1979).
 
 
 21
 As stated by Judge Simpson in Parker v. Motorola, Inc., 524 F.2d 518, 535 (5th Cir. 1976), cert. denied, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976), "(a)lthough the type of misconduct before the Patent Office which results in the invalidity of a patent admits to no fixed parameters, it is necessary that there be some element of wrongfulness, wilfulness, or bad faith." And in Norton v. Curtiss, 433 F.2d 779, 57 CCPA 1384 (1970), the Court of Customs and Patent Appeals elaborated on the scienter requirement for a finding of fraud and concluded that gross negligence could suffice as a sufficiently culpable state of mind.[4] Moreover, the presence of this mental element must be proven by clear and convincing evidence. Scott Paper Co. v. Fort Howard Paper Co., 432 F.2d 1198 (7th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971); Schnadig Corp. v. Gaines Mfg. Co., 494 F.2d 383 (6th Cir. 1974); Norton v. Curtiss, supra.
 
 
 22
 The trial court did not address the need to find any bad faith on Burgess' part in failing to disclose the newspaper step of his process. The only mental element addressed by the trial court in either its oral opinion or its written findings of fact and conclusions of law was Burgess' knowledge of the step and of its necessity to his process. However, the presence of such knowledge is compatible with the presence of good faith on Burgess' part and so does not, standing alone, warrant a finding of the necessary state of mind for fraud. Every inventor has knowledge of the steps in his own invention. Consequently, such knowledge is of little use in distinguishing fraudulent from nonfraudulent omissions. Nor is knowledge that the step is necessary to a process incompatible with good faith. 35 U.S.C. § 112 requires an applicant to disclose so "as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *." The statute gears the standard to the person "skilled in the art," and the Supreme Court in Mowry v. Whitney, 14 Wall. 620, 81 U.S. 620, 20 L.Ed. 860 (1872), and Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 (1882), held that the applicant may assume that which is common knowledge and well known to persons skilled in the art. 2 D. Chisum, Patents § 7.03(2), at 7-18 (1979). Finding of Fact No. 101 states that "the use of a barrier web for carpet seaming tape was known in the art for many years prior to March of 1966," Carpet Seaming, supra, 197 U.S.P.Q. at 240. The use of just such a barrier is the very step which Burgess omitted in his "703" patent application. Thus, Burgess might well have concluded in good faith that inclusion of the newspaper step was not a required disclosure even if it was necessary to the practice of his process.
 
 
 23
 Other factors present in this case further demonstrate that the knowledge on Burgess' part found by the trial judge does not preclude the presence of good faith. The process, as described without the newspaper step, was not totally inoperable. Rather, it could be practiced installing carpets over concrete floors since the hot-melt adhesive will not adhere to concrete.
 
 
 24
 We do not find it necessary to pass on the adequacy of the disclosures made in connection with the "703" patent application, since that patent was not at issue in the trial. The above comments on the disclosures made are solely for the purpose of demonstrating the need for further treatment by the trial court of Burgess' state of mind in ruling on the fraud issue. The court's finding of knowledge on Burgess' part did not obviate further examination of the good faith issue. In Xerox Corp. v. Dennison Mfg. Co., 322 F.Supp. 963, 968-69 (S.D.N.Y.1971), Judge Mansfield stated:
 
 
 25
 "(A)n applicant for a patent should be accorded the right to exercise good faith judgment in deciding what matters are and are not of sufficient relevance and materiality to require disclosure. Only when he is guilty of fraud, willfulness or recklessness indicating a disregard for his duty of frankness should enforcement of the patent be barred. * * * Furthermore, the authorities cited by defendants simply do not support their contention that mere negligent omissions or misstatements before the Patent Office would be unclean hands. On the contrary, they reveal that fraud or reckless disregard for the facts must be established." Citations omitted.
 
 
 26
 Our conclusion that the trial judge did not include the proper mental element as part of the fraud standard is further buttressed by his failure to mention any mental element besides Burgess' knowledge as outlined above, and the fact that the cases he cited in support of his fraud conclusion of law, Conclusion of Law No. 1, Carpet Seaming, supra, 197 U.S.P.Q. at 247, are not fraud but inadequate disclosure cases. Only one of the cases cited reached a fraud finding. In Shelco, Inc. v. Dow Chemical Co., 322 F.Supp. 485 (D.Ill.1970), aff'd, 466 F.2d 613 (7th Cir. 1972), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972), the court found fraud as an alternative ground in a case which involved a pattern of positive misrepresentations as well as withholding of information, along with an intent to deceive the Patent Office. The rest of the cases cited[5] merely involved findings of a void or invalid patent due to inadequate disclosure, and no fraud was found. The cases most similar to this case on their facts were Koehring Co. v. National Automatic Tool Co., 257 F.Supp. 282 (S.D.Ind.1966), aff'd, 385 F.2d 414 (7th Cir. 1967); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1 (D.Md.1963), aff'd p. c. 327 F.2d 497 (4th Cir. 1964), cert. denied, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964); and Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372 (E.D.Mich.1966). All three involved failure to disclose an indispensable element or step in a process or invention. Each resulted in a finding of invalidity of the patent, but no fraud.
 
 
 27
 We thus hold that the trial judge applied an inaccurate standard for assessing fraud. Consequently, his finding of fraud in the application for the "703" patent is reversed.
 
 B
 
 28
 Since the trial court's application of the unclean hands doctrine was premised on the fraud finding with respect to the "703" patent, it is necessary to reverse the trial court's ruling on that doctrine as well. The trial court concluded that the fraud found in the "703" patent dictated invalidity not only for the "703" patent, but also for the "038", "876", and "830" patents. A comparison of the facts of this case with the cases cited by the trial judge for the proposition that fraud in connection with one patent may invalidate other patents sought to be enforced by the perpetrator of the fraud demonstrates that reversal of the bar to the "038", "876", and "830" patents on the basis of the unclean hands doctrine is proper. He relied upon three cases. East Chicago Machine & Tool Corp. v. Stone Container Corp., 181 U.S.P.Q. 744 (N.D.Ill.1974), involved an intentional withholding of prior art as well as positive misrepresentations to the Patent Office. Intent was clearly stated as a necessary element. The applicant, in addition, could offer no satisfactory explanation to rebut the inference of intent. Even in this case, the fraud, which involved only one claim of a patent, was found to taint only the other claims of the same patent not to spread to other patents as well. In the case of Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), the patent applicant arranged a pay-off bargain to suppress relevant prior art. The case emphasizes the need for bad faith for application of the unclean hands doctrine. Finally, the case of Marconi Wireless Telephone Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943), involved overclaiming in a patent application, not inadequate disclosure. There the Supreme Court emphasized fraudulent or deceptive intention as crucial to application of the unclean hands doctrine and underscored the importance of allowing evidence of explanation or excuse going to intent.
 
 C
 
 29
 Next, the trial court ruled the four patents in suit unenforceable because appellant Carpet Seaming violated Section 2 of the Sherman Act by unlawfully attempting to monopolize and conspiring to monopolize the manufacture and sale of hot-melt thermoplastic carpet seaming tapes, as follows:
 
 
 30
 "(F)irst, through the unlawful accumulation on the part of Giffen Industries, Inc. and its subsidiaries, of the Burgess and Clymin patents and exclusive license rights under the Winkler patent; secondly, in the knowingly wrongful assertion by plaintiff's licensor L. D. Brinkman & Co., Inc. and its predecessor, of the Clymin patent as covering ribbed tape against defendant Best Seam, Incorporated and others; and, thirdly, in the unlawful combination of the Giffen Companies through plaintiff with Bruck Industries, Inc. for the enforcement of the Burgess, Clymin and Winkler patents against competitors of Bruck Industries, Inc. and Laminated Plastics, including particularly defendant, Best Seam, Incorporated, Vectron, Inc., Orcon Corporation and Kinkaid Industries, Inc." Conclusion of Law No. 5; Id.
 
 
 31
 These conclusions as to misuse and antitrust violations when viewed in conjunction with the trial court's findings of fact demonstrate that the law applied at the trial deviated from the correct legal standards governing the offenses recounted. The trial court's legal conclusions are so summary that it is virtually impossible to ascertain what legal standards were in fact applied, and the factual record and findings are so sparse in some essential areas that independent assessment of the presence of the elements of the named violations is impossible. We therefore provide guidance as to the governing law and remand for further development of the facts necessary for its application.
 
 
 32
 In this circuit, a prima facie case of attempt to monopolize requires proof of three elements: (1) specific intent to control prices or destroy competition with respect to a part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848 (9th Cir. 1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); Purex Corp. v. Proctor & Gamble Co., 596 F.2d 881 (9th Cir. 1979). The trial judge neither made a specific finding as to the probability of success of the appellant and the other parties, nor are there facts in the record from which we can independently assess such a probability.
 
 
 33
 An essential element of both attempt and conspiracy to monopolize is specific intent. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The trial court made no finding that the appellant possessed the specific intent required for an antitrust violation. Rather, in its findings of fact, the trial court repeated several times that the purpose of both appellant and the other parties to the pooling agreement was to license the entire carpet seaming industry. Findings of Fact Nos. 184, 185. Standing alone, this amounts to no more than an intent to legally exploit the power inherent in the patent grant, which a patent holder is entitled to do. To show misuse, a patentee must have the purpose of exercising anticompetitive power outside the lawful scope of that granted by the patent.
 
 
 34
 The accumulation of patents is not per se illegal. A patent pool may, however, be rendered unlawful if accompanied by an illegitimate purpose or anticompetitive consequences beyond those inherent in the grants of the patents in question. The trial judge made no findings of specific adverse impact on the market for hot-melt carpet seaming tapes. Consequently, we are forced to conclude that he relied on illicit purpose as rendering illegal the pooling of the Burgess, Winkler, and Clymin patents.
 
 
 35
 A well-recognized legitimate purpose for a pooling agreement is exchange of blocking patents. Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926 (1931); International Mfg. Co. v. Landon, Inc., 336 F.2d 723 (9th Cir. 1964), cert. denied, 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965); Cutter Laboratories v. Lyophile-Cryochem Corp., 179 F.2d 80 (9th Cir. 1949). The trial court's sixth conclusion of law demonstrates a misunderstanding as to the nature of the relationship between two patents which can give rise to a blocking situation. The trial judge found that the Winkler and Clymin patents did not block the Burgess patents, but ignored the possibility that the Burgess patents may well have blocked the Winkler and Clymin patents despite well-established law that patents on basic processes and products may block patents on improvements to those products and processes. As the Supreme Court stated in Standard Oil Co. v. United States, supra, 283 U.S. at 172, n. 5, 51 S.Ct. at 424:
 
 
 36
 "This is often the case where patents covering improvements of a basic process, owned by one manufacturer, are granted to another. A patent may be rendered quite useless, or 'blocked,' by another unexpired patent which covers a vitally related feature of the manufacturing process. Unless some agreement can be reached, the parties are hampered and exposed to litigation. And, frequently, the cost of litigation to a patentee is greater than the value of a patent for a minor improvement."
 
 
 37
 Similarly, the Ninth Circuit, in Cutter Laboratories v. Lyophile-Cryochem Corp., supra, 179 F.2d at 93, gave the following treatment to a factual situation in which two companies had each developed improvements to the other company's basic patents:
 
 
 38
 "Stokes, interested in the manufacture of freeze-drying apparatus, conducts research for improvements in that apparatus. In the course of that research, it incidentally discovers improvements in freeze-drying processes and freeze-dried medical products. It is entitled to a patent monopoly on those improvements, but it cannot directly exploit those patents without going outside its normal field, which is machinery. Sharp & Dohme, on the other hand, is in a position to exploit the improvements. Moreover it is faced with the same problem, for it is in no position to exploit directly the improvements in machinery which it discovers in the course of its research. It is consistent with the spirit, as well as the letter, of the patent laws that each of these two companies should arrange to use the other in order to reap the rewards to which it is entitled as patentee and yet which it is in no position to reap by itself."
 
 
 39
 The economics underlying this attitude toward the accumulation of improvement patents is ably and succinctly stated by Professor Ward S. Bowman:
 
 
 40
 "If, * * * one patent was subservient to the other, an improvement patent unusable without infringing the basic patent, then combining or pooling them eliminates no user alternative. In terms of possible trade restraint, this case is indistinguishable from a vertical merger. The two patents combined * * * could not restrict output or raise price any more than if the two were exploited separately." W. Bowman, Patent and Antitrust Law at 201 (1973).
 
 
 41
 A reversal of the trial court's conclusion on blocking is thus required, as well as reversal of its conclusion as to misuse, since the blocking issue bears directly on the question of illicit purpose of the pooling agreement even though the Winkler patent was found invalid on other grounds not appealed.
 
 
 42
 Finally, we must consider the wrongful assertion and enforcement of the pooled patents as a ground for violation of the antitrust laws and misuse. Once again, the trial court's treatment of the question makes it difficult to determine what standard was applied at trial in assessing the violation. Attempted enforcement of a patent does not amount to a violation of the antitrust laws. 35 U.S.C. § 271, for example, provides that:
 
 
 43
 "(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: * * * (3) sought to enforce his patent rights against infringement or contributory infringement."
 
 
 44
 To amount to an antitrust violation or patent misuse, such attempted enforcement must be in bad faith. 8 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 59.08 (1979). Moreover, infringement suits are presumed to be in good faith, a presumption which can be rebutted only by clear and convincing evidence. Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986 (9th Cir. 1979). The trial court did not mention, much less give adequate consideration, to the requisite element of bad faith, the presumption of good faith, or the appropriate high burden of proof on this issue.
 
 
 45
 Upon remand, appellant should be granted the opportunity to prove that any misuse has been abandoned and that the consequences have been dissipated. 4 D. Chisum, Patents § 19.04(4) (1979); Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942).
 
 
 46
 The judgment of the trial court is REVERSED and REMANDED for further proceedings not inconsistent with this Opinion.
 
 
 
 *
 Honorable William H. Orrick, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 In December, 1969, the Clymin patent was issued to Conso Engineering Co., a subsidiary of Consolidated Foods Corporation ("CFC"). CFC initiated litigation against Giffen concerning the validity and infringement of the Burgess patents held by Giffen. The claim relating to the "703" process was dismissed, and the remaining claims settled in December, 1974. Pursuant to the settlement, CFC assigned the Clymin patent to Giffen, reserving for itself a nonexclusive license under the patent. CFC in turn received a covenant from Giffen not to sue CFC under the Burgess patents and the right to twenty percent of any royalties collected for licenses granted under the Clymin patent. However, no such licenses have been granted, and no royalties have been paid to CFC
 
 
 [2]
 In 1970, embossed ribbed tape came into the market and has since become the most popular variety of hot-melt adhesive carpet seaming tape. The Winkler patent describing this embossed tape was issued to Bruck Industries, Inc. ("Bruck") in August, 1973. In 1970, Bruck had been licensed under the Burgess patents by Giffen. However, Bruck stopped payment of royalties due to the CFC litigation. After the settlement of that case, Giffen sued one of Bruck's distributors. Bruck responded with a suit for declaratory judgment of invalidity and noninfringement and a separate suit for infringement of the Winkler patent. These actions were settled in the spring of 1976 by Giffen forming the appellant corporation herein. Appellant received exclusive licenses under the Burgess, Clymin, and Winkler patents, and Bruck received rights to a two-and-a-half percent reduction in the royalty rate for licenses which were granted to it by appellant in accordance with appellant's standard nonexclusive license arrangement. Bruck also agreed to pay $75,000 liquidated past royalties upon condition that other major infringers either be licensed or sued for infringement
 
 
 [3]
 In conjunction with this point, it is worthwhile to repeat the admonition found in both case law and treatise that despite the obvious value in expeditious disposition of cases, Rule 41(b) motions should be granted only in clear cases and "in the interest of obtaining a full and complete picture for both the trial and the appellate court it may be advisable to deny the defendant's motion, put the defendant to its proof, and then decide the case when all the evidence has been adduced." 5 J. Moore, Federal Practice § 41.13(4) at 41-192 (2d ed. 1979); see also, Riegel Fiber Corp. v. Anderson Gin Co., 512 F.2d 784 (5th Cir. 1975); White v. Rimrock Tidelands, Inc., 414 F.2d 1336 (5th Cir. 1969)
 In addition, the trial judge relied in large part upon findings of fact submitted by the parties which contained an abundance of superfluous material and all too little of the facts needed to properly resolve the matters at issue. The responsibility of the trial judge to make his or her own findings of fact has been emphasized repeatedly. The 1946 Advisory Committee Note to Subdivision (a) of Federal Rule of Civil Procedure 52 stated that such findings "should represent the judge's own determination and not the long, often argumentative statements of successful counsel." The Advisory Committee Note cited with approval United States v. Forness, 125 F.2d 928 (2d Cir. 1942), cert. denied, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942), in which Judge Jerome Frank stated:
 "We have recently asked for 'brief and pertinent findings of contested matters * * * rather than the delayed, argumentative, overdetailed documents prepared by winning counsel.' Matton Oil Transfer Corp. v. Tug Dynamic, 2 Cir., Dec. 1, 1941, 123 F.2d 999, 1001. Otherwise, we lose the benefit of the judge's own consideration. In the instant case, a comparison of the findings with the opinion seems to show that the findings proposed by the defendants were mechanically adopted, with the consequence that some of the findings made by the district court are not supported by the evidence and not substantially in accord with the opinion. Such a result can usually be avoided by following what we believe is the better practice of filing findings with the opinion, when the evidence is still fresh in the mind of the trial judge, and permitting the parties to file objections under Federal Rules of Civil Procedure, rule 52(b). See Matton Oil Transfer Corp. v. Tug Dynamic, supra.
 We stress this matter because of the grave importance of fact-finding. The correct finding, as near as may be, of the facts of a law suit is fully as important as the application of the correct legal rules to the facts as found. An impeccably 'right' legal rule applied to the 'wrong' facts yields a decision which is as faulty as one which results from the application of the 'wrong' legal rule to the 'right' facts. The latter type of error, indeed, can be corrected on appeal. But the former is not subject to such correction unless the appellant overcomes the heavy burden of showing that the findings of fact are 'clearly erroneous.' Chief Justice Hughes once remarked, 'An unscrupulous administrator might be tempted to say "Let me find the facts for the people of my country, and I care little who lays down the general principles." ' That comment should be extended to include facts found without due care as well as unscrupulous fact-finding; for such lack of due care is less likely to reveal itself than lack of scruples, which, we trust, seldom exists. And Chief Justice Hughes' comment is just as applicable to the careless fact-finding of a judge as to that of an administrative officer. The judiciary properly holds administrative officers to high standards in the discharge of the fact-finding function. The judiciary should at least measure up to the same standards.
 It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of the upper courts. While it does serve that end, it has a far more important purpose that of evoking care on the part of the trial judge in ascertaining the facts. For, as every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of that duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper. The trial court is the most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts. When a federal trial judge sits without a jury, that responsibility is his. And it is not a light responsibility since, unless his findings are 'clearly erroneous,' no upper court may disturb them. To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible. For that very reason every effort should be made to render it as adequate as it humanly can be." Id. at 942-43 (footnotes omitted).
 
 
 [4]
 The court in Norton v. Curtiss, 433 F.2d 779, 795-96, 57 CCPA 1384 (1970), noted:
 "The state of mind of the one making the representations is probably the most important of the elements to be considered in determining the existence of 'fraud'. Perhaps it is most of all in the traditional element of 'scienter' that the existence of a fiduciary-like duty should have its effect. As we have already indicated, the procurement of a patent involves the public interest, not only in regard to the subject matter of the patent grant, but also in the system under which that grant is obtained. Conduct in this area necessarily must be judged with that interest always taken into account and objective standards applied. Good faith and subjective intent, while they are to be considered, should not necessarily be made controlling. Under ordinary circumstances, the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth."
 
 
 [5]
 Permutit Co. v. Graver Corp., 284 U.S. 52, 58, 52 S.Ct. 53, 76 L.Ed. 163 (1931); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1, 44, 137 U.S.P.Q. 725, 759 (D.Md.1963), aff'd per curiam, 327 F.2d 497, 140 U.S.P.Q. 285 (4th Cir. 1964), cert. denied, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964); Farmer Bros. Co. v. Coca-Cola Co., 384 F.Supp. 595, 184 U.S.P.Q. 587 (C.D.Cal.1974); Shelco, Inc. v. Dow Chemical Co., 322 F.Supp. 485, 509-10, 168 U.S.P.Q. 395, 414-16 (D.Ill.1970), aff'd, 466 F.2d 613 (7th Cir. 1972), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972); Koehring Co. v. National Automatic Tool Co., 257 F.Supp. 282, 287, 150 U.S.P.Q. 777, 780-81 (D.Ind.1966), aff'd, 385 F.2d 414, 155 U.S.P.Q. 231 (7th Cir. 1967); Henry J. Kaiser Co. v. McLouth Steel Corp., 257 F.Supp. 372, 427-28, 150 U.S.P.Q. 239, 282-83 (E.D.Mich.1966)